**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

| | | |
|---|---|---|
| TRUE LEE LOUDSPEAKERS, LLC,<br><br>Plaintiff,<br><br>v.<br><br>JAM INDUSTRIES USA, LLC,<br><br>Defendant. | :<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>: | Case No.: 3:26-cv-1532<br><br><br>**Jury Trial Demanded**<br><br>September 21, 2026 |

## COMPLAINT

## INTRODUCTORY STATEMENT

1. This is an action to hold Defendant JAM Industries USA, LLC ("Jam Industries" or "Defendant") responsible for its intentional breaches of an exclusive distributorship agreement, which were, pre-contract termination, designed to leave Plaintiff True Lee Loudspeakers, LLC ("True Lee" or "Plaintiff") in such a position that it would have no choice but to accept a bargain-basement purchase price from Jam Industries and, post-termination, are meant to stifle competition by preventing a now-competitor's ability to participate in the marketplace.

2. True Lee is the manufacturer of the BASSBOSS brand of high-output professional loudspeakers and subwoofers, designed by co-founder David Lee and used by touring sound companies, DJs, nightclubs, festivals, and event production companies across the country, as well as in select studio installations. In 2022, True Lee was approached by Jam Industries, which does business as American Music & Sound, for Jam Industries to become the exclusive distributor of True Lee products in the United States. Jam Industries is one of the largest distributors of music equipment in the United States, and, in theory, working with it would be a way to rapidly grow the customer base and revenues of True Lee. The expectation was that Jam Industries would use its

outsized market presence to promote True Lee's products to its extensive network of dealers throughout the country.

3. True Lee and Jam Industries subsequently entered into an exclusive distributorship agreement, which gave Jam Industries the exclusive right to sell True Lee products to its network of dealers. True Lee was giving up essentially all rights to sell its own products in the USA: under the Agreement.[1] In exchange for surrendering control of its marketing and sales efforts, True Lee bargained for a minimum yearly purchase requirement that escalated each year. That provision would allow True Lee to accurately project its manufacturing needs, staffing, and revenue, and would give it certainty in exchange for foregoing the ability to otherwise control its own destiny in the marketplace. Further, the distribution agreement was structured so that it automatically renewed and could not be terminated except for cause.

4. Since 2022, True Lee has lived up to its side of the bargain, but Jam Industries has not. In every single contract year, Jam Industries has failed to purchase the required minimum amounts, often falling short by millions of dollars.

5. In April 2026, True Lee approached Jam Industries about ending the relationship in an amicable and orderly fashion. In response, Jam Industries represented that it wanted True Lee to develop a new line of products and that the parties should sign a new agreement, which Jam Industries represented would come with a large capital commitment. True Lee, relying on those representations, devoted substantial time and resources to the proposed line and expressly advised Jam Industries in writing that it was preserving substantial component inventory for the proposed line rather than deploying it into BASSBOSS production. The promised proposal never came.

[1] Even any direct-to-consumer sales originating from True Lee's own website were required to be fulfilled exclusively through Jam Industries, with True Lee having to pay Jam Industries the standard price it charged dealers. Considering the low volume of direct sales through True Lee's website, virtually every dollar of True Lee's United States revenue flowed through Jam Industries.

Over the intervening months Jam Industries continued to purchase almost no True Lee products, placing True Lee in an ever more financially precarious position. Jam Industries' senior leadership understood this fact well: when True Lee had raised serious liquidity concerns due to the low ordering volumes from Jam Industries on previous occasions, a Jam Industries' senior executive responded, in substance, that he could not help True Lee with liquidity, but that Jam Industries remained interested in acquiring the company.

6. Ultimately, Jam Industries' continued failure to purchase products and its refusal to consider any other feasible solutions left True Lee with no choice but to send Jam Industries a breach of contract notice on July 16, 2026, giving Jam Industries 30 days to cure its breach. Jam Industries made no effort to cure, and the Agreement terminated on August 15, 2026. The distributor agreement required Jam Industries, upon termination, to immediately cease its use of True Lee's trademarks and to immediately stop selling True Lee's products. It also required True Lee to purchase all True Lee products currently in Jams Industries' inventory back from Jam Industries at their landed cost (i.e. the cost that Jam Industries had paid for the products). Instead of complying, Jam Industries continued after termination to use True Lee's marks, and solicit and make further sales of True Lee products at below-market prices. It only ceased engaging in this conduct, weeks after termination, after receiving a cease and desist warning in writing from True Lee's counsel. Jam Industries engaged in this conduct all the while knowing that True Lee, due to Jam Industries' failure to purchase products during the contractual term and True Lee's delays in manufacturing while waiting for Jam Industries' promised proposal about a new product line that never materialized or some other kind of proposal on how to resolve the situation, did not have a ready supply of products on hand to begin selling into the market. Further, Jam Industries delayed for over a month in even supplying True Lee with a detailed list of inventory in its possession, and

only then provided a list of inventory as a month post-termination. It, to this date, has refused to provide any transaction level sales history showing what has occurred between July 16th and the present. This delay in providing even basic information was done to prevent True Lee from being in a position to attempt to buyback the inventory in Jam Industries' position, so that True Lee would be delayed from reentering into the marketplace through direct distribution channels. Jam Industries' conduct is that of a dominant market participant looking to stifle competition.

7. In short, Jam Industries has behaved like its contractual obligations are optional, and that it can simply take whatever actions it believes are in its interests, even if those actions are unlawful and designed to cripple a smaller competitor. True Lee was forced to file this lawsuit to prevent Jam Industries from continuing to engage in unlawful conduct and to recover the millions of dollars in damages owed to it.

## THE PARTIES

8. Plaintiff True Lee Loudspeakers, LLC, is a manufacturer of loudspeakers and subwoofers specializing in high-output powered professional loudspeakers for live sound, DJs, nightclubs, festivals, and event production, with select studio applications. True Lee is a Texas limited liability company and has a principal place of business at 10421 Old Manchaca Road, Suite 420, Austin, Texas 78748. All of its members are citizens of either Texas or California, and, as such, it is a citizen of Texas and California.

9. Defendant Jam Industries USA, LLC is a distributor and marketer of musical instruments, professional audio and lighting equipment, and consumer electronics, doing business under the brand name "American Music & Sound." Jam Industries is a Delaware limited liability company and has a primary office at 310 West Newberry Road, Bloomfield, Connecticut 06002.

Upon information and belief, no members of Jam Industries are citizens of either Texas or California.

## JURISDICTION AND VENUE

10. True Lee brings this civil suit under, among other authorities, 15 U.S.C. § 1051 et seq. This Court has subject matter jurisdiction over this action pursuant to those statutes and 28 U.S.C. § 1331 (providing district courts with original jurisdiction over an action arising under the Constitution and laws of the United States). The Court otherwise has supplemental jurisdiction over all state law claims pursuant to 28 U.S.C. § 1367.

11. This Court also has subject matter jurisdiction over Plaintiff's claims under 28 U.S.C. § 1332. The amount in controversy exceeds $75,000 and the Parties are citizens of different states.

12. Venue is proper in the U.S. District Court for the District of Connecticut pursuant to 28 U.S.C. § 1391(b). Defendant is headquartered in Connecticut. Further, a substantial part of the events or omissions giving rise to the claims herein occurred in Connecticut.

13. The Court has personal jurisdiction over Jam Industries because it has a headquarters in Connecticut, making it essentially "at home" in Connecticut and thus subject to the general jurisdiction of Connecticut courts. Further, specific personal jurisdiction is also present because Jam Industries engaged in the conduct complained of herein largely from its Connecticut location.

## FACTUAL ALLEGATIONS

14. Plaintiff is engaged in the business of manufacturing and selling professional audio equipment under the brand name "BASSBOSS." The BASSBOSS brand is well known in the music industry, and, in recognition of its value and association with True Lee's products, True Lee has been granted multiple federal trademarks, including: BASSBOSS brand mark: Serial number

86071851 Registration number 4525434, class 09; BASSBOSS word mark: Serial number 90058266, Registration number, 6505322, class 09.

15. Defendant is a wholesale distributor of musical instruments and professional audio gear, serving retailers, contractors, and integrators. Defendant is one of the largest distributors of musical instruments and equipment in the United States, and wields considerable market power and influence in these industries.

16. In 2022, Jam Industries approached True Lee about Jam Industries becoming the exclusive distributor of True Lee's BASSBOSS line of products. True Lee was very interested in having such a relationship with Jam Industries, due to its scale and reach. True Lee believed that such a relationship would allow it to rapidly expand its customer base and grow beyond its current capabilities. True Lee, however, would be giving up all distribution rights in the United States, effectively ceding control of its ability to maintain or grow its market share. As such, True Lee bargained for a minimum purchase requirement in the contract, which Jam Industries accepted.

18. Accordingly, on August 4, 2022, the Parties entered into a Distributorship Agreement outlining the terms and conditions by which Plaintiff would sell various products to Defendant throughout the next three (3) years and in any subsequent renewal periods. *See* Exhibit 1 ("Distributorship Agreement" or "Agreement") at Article 12(a).

### A. <u>Jam Industries Consistently Fails to Purchase the Minimum Required Amount of Inventory</u>

19. As part of the Distributorship Agreement, Defendant agreed to a minimum purchase requirement of not less than $6,490,000 for the period of the first twelve (12) months from the agreement date of August 4, 2022. Exhibit 1 at Article 3.

20. The Distributorship Agreement contemplated that this annual purchase amount would increase each year and that the agreement would renew annually by stating in Article 12:

> This Agreement shall be valid and in force for a period of Three (3) years commencing from the date above written upon signing of both THE COMPANY and the Distributor. This Agreement shall be automatically renewed annually on the same terms and conditions as this Agreement save and except that the minimum purchase amount for subsequent annual terms shall be agreed upon by the parties, acting reasonably, no less than sixty (60) days prior to the beginning of the annual term. Failing which, the minimum purchase amount for each subsequent annual term shall be one hundred and five percent (105%) of the minimum purchase amount in the previous year.

21. For the duration of the Distributorship Agreement, the Parties did not ever reach a specific agreement on the annual minimum purchase amounts, and, as such, they simply increased to 105% of the prior annual year's amount.

22. During each contract year after 2023, Jam Industries never purchased the required amount. Indeed, the below chart sets forth the minimum requirements and True Lee's most recent calculation of the actual amounts purchased:

| **Contract Year** | **Minimum Required Purchases** | **Actual Purchased** | **Shortfall** | **Percentage of Minimum** |
|---|---|---|---|---|
| August 4, 2023 to August 3, 2024 | $6,814,500.00 | $1,849,019.82 | $4,965,480.18 | 27.13% |
| August 4, 2024 to August 3, 2025 | $7,155,225.00 | $2,009,282.28 | $5,145,942.72 | 28.08% |
| August 4, 2025 to July 31, 2026 | $7,512,986.25 | $2,164,955.98 | $5,348.030.27 | 28.81% |

23. Defendant's failure to purchase the minimum amount of product was a breach of Articles 3 and 12(a) of the Distributorship Agreement as outlined above.

24. Article 13(a)(i) of the Distributorship Agreement authorizes either party to terminate the agreement "with immediate effect," if the other party "commits a material breach (including but not limited to Article 3) of any of the terms of this Agreement and (if such a breach is capable of remedy) fails to remedy that breach within 30 days of that party being notified of the breach."

25. Throughout the relationship, True Lee repeatedly advised Jam Industries that Jam Industries' purchasing levels were inadequate to sustain True Lee's operations and were creating serious financial strain. Those concerns were communicated directly to multiple Jam Industries personnel, including Rob Impala, Samia Scoda, Dean Downey, and Patrick Sullivan, and were memorialized in writing on multiple occasions, including a March 17, 2025 email regarding the gap in purchase orders and the resulting cash-flow strain, and a September 10, 2025 email advising Jam Industries of True Lee having to accept unfavorable payment terms with their vendors due to its current cash position. This cash position was caused by Jam Industries' unwillingness to maintain the contractually required purchase volume.

26. Jam Industries was informed in a January 2025 meeting attended by multiple Jam Industries personnel and True Lee leadership that True Lee's revenue had fallen to fifty percent of its pre-distribution agreement levels, and that True Lee needed Jam Industries to ensure purchases of at least $150,000 per month (which were still well below the required contractual minimum and still well below pre-Distribution Agreement levels) to ensure that True Lee would remain a viable company. Despite Jam Industries' awareness of the harm being caused by its actions, in the months

that followed, Jam Industries' purchases repeatedly were below this threshold, including some months in which Jam Industries placed no orders at all.

27. Further, during much of 2026 and at various other times during the Agreement, Jam Industries did not provide the regular purchase projections required by Article 5(d) of the Agreement. The failure to provide projections left True Lee with little ability to plan for its manufacturing needs, causing disruption to the manufacturing process and leaving True Lee unable to engage in significant manufacturing activities. Jam Industries' consistent failures to make the required amount of purchases deprived True Lee of a consistent revenue stream. Indeed, during the 2026 calendar year, Jam Industries has only purchased $560,000 in products from True Lee.

**B. <u>Jam Industries Dangles a New Deal In Front of True Lee</u>**

28. On April 16, 2026, after True Lee advised Jam Industries that the existing arrangement had become financially unsustainable and that True Lee intended to transition to direct distribution, Jam Industries sought to induce True Lee to not exercise its contractual rights to declare Jam Industries in default and exit the Agreement. It instead proposed that True Lee develop and manufacture a separate line of dealer and integrator products for Jam Industries to distribute, and represented that the arrangement would include a large capital commitment from Jam Industries.

29. True Lee responded positively and devoted substantial time and resources to the proposed line. True Lee expressly advised Jam Industries that it would preserve hundreds of thousands of dollars in component inventory for the proposed line, rather than deploy those components into additional BASSBOSS production. Jam Industries did nothing to suggest that True Lee should instead continue to use those components in its manufacturing process to prepare for a switch to direct distribution, and instead allowed True Lee to believe that a new deal was coming.

30. On June 4, 2026, Jam Industries advised True Lee in writing that a memorandum of understanding for the proposed line was "shaping up" and that a draft had been reviewed, but True Lee never received a draft because of the conduct of a Jam Industries representative, who changed factory setting to BASSBOSS products without True Lee's approval before they were to be demonstrated to the public and who otherwise made disparaging remarks to True Lee personnel who were present. This conduct made it impossible to trust that Jam Industries would be a good faith partner in the new line of equipment.

**C. Jam Industries' Longstanding Interest in Acquiring True Lee**

31. Jam Industries repeatedly expressed its interest in acquiring True Lee. In August 2023, at an Atlantic City, New Jersey meeting, Patrick Sullivan discussed Jam Industries' interest in a potential acquisition of True Lee in a private conversation with True Lee's CEO at which Jam Industries' Vice President Rob Impala was present. In August 2024, again at an Atlantic City, New Jersey meeting, Mr. Sullivan raised Jam Industries' acquisition interest in a further private conversation with True Lee's CEO at which Mr. Impala was again present. The interest was well-known and acknowledged by Jam Industries executives.

32. In September 2025, at a meeting in Los Angeles attended by at least Mr. Sullivan, Mr. Impala, True Lee's CEO Lian Amber, and True Lee's co-founder and Designer David Lee, True Lee raised serious liquidity concerns arising from Jam Industries' inadequate purchasing. Mr. Sullivan responded, in substance, that he could not assist True Lee with liquidity, but that Jam Industries remained interested in acquiring the company.

33. Taken together and in the context of Jam Industries' other behavior, it is clear that Jams Industries' true intent was to squeeze True Lee financially so that it could induce True Lee to sell the company in a distressed state.

### D. <u>True Lee Terminates the Agreement</u>

34. By July 2026, True Lee had no choice but to send a notice of default. On July 16, 2026, True Lee formally sent Defendant a Notice of Breach, explaining that Jam Industries was in breach of its minimum purchasing obligations and offering Defendant the opportunity to cure its breach by August 15, 2026. *See* Exhibit 2 ("Notice of Breach").

35. The Notice of Breach indicated that if Defendant "do[es] not cure these breaches by August 15, 2026, then the Distributor Agreement will terminate immediately without further notice on that date." *Id.* at 2.

36. Defendant did not make any effort to cure its breaches.

37. Accordingly, the Distributorship Agreement terminated on August 15, 2026, thirty (30) days after the Notice of Breach was sent on July 16, 2026.

38. Article 14(a)(i) of the Distributorship Agreement provides that upon termination of the Agreement under Article 13(a)(i), Plaintiff "shall repurchase from [Defendant] any of the Products then in the possession of or under the control of [Defendant] at landed cost." Jam Industries only provided a detailed inventory list on September 18, 2026, more than a month after the termination. Further, Jam Industries has refused to provide any supporting landed-cost documentation, or transaction-level sales reporting. However, the information that Jam Industries has provided shows the claimed value of the inventory declining from approximately $3.78 million to approximately $2.64 million during the ten weeks following the Notice of Breach.

39. As outlined in the Notice of Breach, Defendant is obligated to compensate Plaintiff for damages incurred by Defendant's breach of the Distributorship Agreement, with such damages being, at minimum, equal to approximately half of the minimum product purchase shortfall, as that

represents the amounts that True Lee would have earned, after product costs, had it received the contractually required orders. The amount of these damages is well over five million dollars.

**E. <u>Jam Industries' Post-Termination Conduct</u>**

40. Pursuant to Article 11(a) of the Distributorship Agreement, Plaintiff authorized Defendant to use Plaintiff's trademarks that specifically apply to Plaintiff's products "in the promotion, advertisement and sale of the Products in accordance with the terms of and for the duration of this Agreement."

41. However, Article 14(a)(ii) of the Distributorship Agreement requires Defendant, upon termination of the Distributorship Agreement under Article 13(a)(i), to "immediately cease to represent itself as an appointed distributor of [Plaintiff's] Products… and shall remove all such references from its stationery, promotional literature and name plates."

42. Article 14(a)(ii) further requires Defendant to "cease to advertise or promote the Products or to make any use of the trademarks and any other Intellectual Property owned by [Plaintiff]" upon termination of the Distributorship Agreement.

43. Articles 13 and 14 of the Agreement collectively make clear that upon termination Jam Industries was required immediately to cease promoting, selling, or advertising True Lee products and using any of the marks or branding associated with them, and instead to sell the remaining products back to True Lee.

44. Instead of exiting the relationship in the manner required by the Agreement, Jam Industries took a number of improper and unlawful actions.

45. First, after receiving the Notice of Breach, Jam Industries began substantially discounting BASSBOSS inventory, including offers at prices materially below ordinary market levels. These discounts were inconsistent with the parties' historical, ordinary-course pricing

practices, and threatened price erosion and harm to the BASSBOSS brand by creating the impression with customers that BASSBOSS products were less valuable or could routinely be obtained at discount prices. Upon information and belief, Jam Industries sought to sell as much of its existing inventory as possible so that there would be little inventory of value left for True Lee to repurchase and so that True Lee would be unable immediately to compete with Jam Industries, and so that the BASSBOSS brand was devalued in consumer's minds.

46. Second, on August 25, 2026, ten days after the Agreement terminated, True Lee learned directly from a senior executive of one of the largest musical-instrument retailers in the United States that Jam Industries had approached the retailer seeking to negotiate a large purchase from Jam Industries' available BASSBOSS inventory to meet demand through the fourth quarter of 2026. Upon information and belief, Jam Industries was encouraging all of its dealers to place large orders like these after the termination of the Agreement.

47. Third, Jam Industries did not cease selling for at least two weeks after the termination and only after True Lee sent a formal cease and desist notification and threatened immediate legal action. Jam Industries is not a mom and pop; it is a sophisticated and experienced business participant represented by both in-house and outside counsel. It is well aware of its contractual obligations and there is no good faith reason that it would continue selling products and using True Lee's marks despite the Agreement's clear prohibitions to not engage in that exact conduct.

48. Fourth, Jam Industries continued to use True Lee's trademarks when promoting the products, had an online dealer purchase portal that remained available for orders.

49. Fifth, Jam Industries failed for over a month to provide even a detailed list of the inventory in its possession, which not only prevented True Lee from even attempting to exercise its contractual repurchase rights, but also let Jam Industries hide from True Lee the amount of

unlawful sales it was making. To date, Jam Industries has failed to provide rudimentary information.

50. Finally, Jam Industries has made various statements to the dealer community, which suggest that True Lee is responsible for the disruption in supply, even though it is Jam Industries' conduct that lead to the termination of the Agreement and even though it is Jam Industries' conduct over the last month that has delayed a proper transition to True Lee selling and fulfilling orders in the direct sales market.

**FIRST CAUSE OF ACTION**

**(Breach of Contract)**

51. Plaintiff repeats the allegations contained in the preceding paragraphs as if fully set forth herein.

52. The Distributorship Agreement between the Parties was a valid, binding contract.

53. Plaintiff performed its obligations under the Distributorship Agreement.

54. Defendant breached the Distributorship Agreement by violating the minimum purchase provisions at Articles 3 and 12(a), as discussed supra.

55. To date and despite receiving notice, Defendant has not cured its breach of the Distributorship Agreement. As such, True Lee properly terminated the Agreement.

56. Further, after the Agreement's termination, Defendant failed to comply with its post-termination obligations, including its obligations immediately to cease use of True Lee's marks and branding, immediately to cease sales of the products, to provide information sufficient to allow True Lee to arrange to buyback the inventory, and to sell the existing inventory back to True Lee at documented landed cost.

57. As a result of these breaches, Plaintiff is entitled to an order requiring Jam Industries to immediately transfer the remaining inventory to it, together with a full accounting.

58. As a result of these breaches, Plaintiff has suffered damages subject to proof at trial, including pre- and post-judgment interest and any other costs and relief that this Court deems appropriate, as a direct and proximate cause of Defendant's breach of contract.

**SECOND CAUSE OF ACTION**
**(Trademark Infringement)**

59. Plaintiff repeats the allegations contained in the preceding paragraphs as if fully set forth herein.

60. Plaintiff is the owner of United States Trademark Registration No. 4525434, class 09; Registration number, 6505322, class 09, for the BASSBOSS name and mark ("BASSBOSS Mark") used in connection with BASSBOSS products, which registration is valid and subsisting

61. As described throughout, the Distributorship Agreement authorized Defendant to act as an appointed distributor of Plaintiff's products bearing the BASSBOSS Mark, subject to the terms and conditions set forth therein.

62. The Distributorship Agreement expressly provided that upon termination of the Distributorship Agreement, Defendant "shall immediately cease to represent itself as an appointed distributor of [Plaintiff's] Products… and shall remove all such references from its stationery, promotional literature and name plates." Exhibit 1 at Article 14(a)(ii).

63. The Distributorship Agreement further provided that upon termination of the Distributorship Agreement, Defendant "shall cease to advertise or promote the Products or to make any use of the trademarks and any other Intellectual Property owned by [Plaintiff]." *Id.*

64. The Distributorship Agreement terminated effective August 15, 2026.

65. Notwithstanding termination of the Distributorship Agreement and the express contractual obligation to cease all use of the BASSBOSS Mark, Defendant continued to, without Plaintiff's authorization or consent, use the BASSBOSS Mark in commerce to advertise, promote, market, and sell BASSBOSS products, including on unauthorized platforms, and continued to hold itself out as authorized to sell and to permit others to sell BASSBOSS products.

66. Defendant's continued use of the BASSBOSS Mark was likely to cause confusion, mistake, or deception among consumers and the trade as to the affiliation, connection, or association between the Parties, and as to the sponsorship or approval by Plaintiff of Defendant's services, in violation of the Lanham Act, 15 U.S.C. §§ 1114 and 1125(a).

67. Defendant's conduct has been committed with knowledge of Plaintiff's rights in the BASSBOSS Mark and knowledge that Defendant's authorization to use the BASSBOSS Mark terminated with the Distributorship Agreement, rendering Defendant's infringement willful.

68. Plaintiff has suffered and continues to suffer monetary damages in an amount to be determined at trial, and Defendant has been unjustly enriched by its unauthorized use of the BASSBOSS Mark.

69. To the extent such conduct continues, Plaintiff has suffered irreparable harm, including damage to the goodwill and reputation associated with the BASSBOSS Mark, for which Plaintiff has no adequate remedy at law.

## THIRD CAUSE OF ACTION
## (Violation of the Connecticut Unfair Trade Practices Act)

70. Plaintiff repeats the allegations contained in the preceding paragraphs as if fully set forth herein.

71. At all relevant times, the Parties were engaged in "trade" and "commerce" as those terms are used in Conn. Gen. Stat. § 42-110a(4).

72. Pursuant to Conn. Gen. Stat. § 42-110b(a), "[n]o person shall engage in unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce."

73. Defendant's pre-termination and post-termination conduct demonstrate a concerted effort first to take over Plaintiff's business, and when that failed, to run Plaintiff out of business. Prior to termination of the Agreement, Defendant engaged in an intentional and concerted effort to mislead True Lee about its intentions, so that True Lee would not terminate the Agreement and so that Defendant could weaken True Lee's financial position. Defendant's clear intent ws to place True Lee in a position where it would have no choice but to sell part or all of itself to Defendant to survive.

74. After receiving the Notice of Breach, Defendant sold its existing inventory at below-market prices and solicited bulk post-termination sales, in a manner inconsistent with its contractual obligations, intentionally damaging True Lee's market position and depriving True Lee of the inventory it needed to re-enter its own market.

75. Following termination of the Distributorship Agreement, Defendant was contractually obligated to immediately cease representing itself as an appointed distributor of Plaintiff's products, to remove all such references from its stationery, promotional literature, and name plates, and to cease all use of Plaintiff's trademarks and other intellectual property.

76. Notwithstanding this obligation, Defendant continued to use Plaintiff's BASSBOSS Mark to advertise and promote Plaintiff's products, continued to sell and solicit sales of the products for weeks after termination, and continued to hold itself out to the public and trade as an authorized or appointed distributor of BASSBOSS products, and as authorized to permit dealers' continued sales, despite having no continuing right or authorization to do so. Defendant intentionally continued selling products, despite having no right to do so, with the further purpose

of depriving True Lee of inventory to sell or potential sources of revenue. In addition, Defendant made various statements to the dealer community suggesting that True Lee was to blame for supply disruptions and seeking to hide its culpability for what was occurring. In addition, Defendant delayed for over a month in providing even a detailed list of inventory on-hand, and otherwise failed to provide basic information. The purpose of this conduct was to interfere with True Lee's ability to reenter the marketplace. The purpose and intent of Defendant's conduct was to stifle competition.

77. Defendant's conduct constitutes an "unfair" and/or "deceptive" act or practice in violation of Conn. Gen. Stat. § 42-110b(a) under the "cigarette rule" criteria, applied by Connecticut courts pursuant to Conn. Gen. Stat. § 42-110b(b), which directs that courts be guided by interpretations of the Federal Trade Commission ("FTC") and federal courts under 15 U.S.C. § 45(a)(1), because Defendant's conduct: (a) offends public policy as established by the Lanham Act, 15 U.S.C. § 1051, et seq., and by Connecticut common law protecting against trademark infringement and misrepresentation of commercial affiliation; (b) offends public policy in that Defendant misrepresented its true intentions regarding the relationship in order to weaken True Lee's financial position to a point that it would either go out of business or could be bought at bargain prices; (c) offends public policy because Defendant's conduct was meant to unfairly prevent True Lee from competing with Defendant and others; (d) is the kind of intentional conduct that goes beyond a mere breach of contract; (e) is unethical, oppressive, or unscrupulous, in that Defendant sought to damage True Lee's financial and market position through its pre-termination and post-termination conduct and otherwise violated True Lee's intellectual property rights by knowingly continuing to trade upon Plaintiff's goodwill and reputation after its authorization to do so ended; and (f) caused substantial injury to Plaintiff, to consumers, and to other

businesspersons who may have been misled as to the true nature of the relationship between Plaintiff and Defendant, injury Plaintiff could not reasonably have avoided because the Agreement's exclusivity provisions foreclosed it from selling through any other channel.

78. Defendant's violation of Conn. Gen. Stat. § 42-110b(a) was committed knowingly, willfully, and/or in reckless disregard of Plaintiff's rights.

79. As a direct and proximate cause of Defendant's violation of Conn. Gen. Stat. § 42-110b(a), Plaintiff has suffered an ascertainable loss of money and/or property within the meaning of Conn. Gen. Stat. § 42-110g(a), including but not limited to damage to its goodwill, loss of control over its trademark and brand, and diversion of business, in an amount to be determined at trial.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff respectfully requests that the Court grant the following relief:

a. Enter a judgment awarding Plaintiff damages for breach of contract, and interest, as proven at trial;

b. Award Plaintiff damages, Defendant's profits, and/or statutory damages as permitted under 15 U.S.C. § 1117;

c. Award Plaintiff actual damages pursuant to Conn. Gen. Stat. § 42-110g(a);

d. Award Plaintiff punitive damages pursuant to Conn. Gen. Stat. § 42-110g(a), on the grounds that Defendant's violation of § 42-110b(a) was committed knowingly and willfully;

e. Direct Defendant to disgorge any profits obtained as a result of its violations;

f. Order Defendant to provide a full accounting of all sales of Plaintiff's products, and of all inventory of Plaintiff's products in its possession, custody, or control, from July 16, 2026 to the present;

g. Order Defendant to provide all information necessary to understand the inventory on hand and its landed cost, and to then transfer to Plaintiff all remaining inventory of Plaintiff's products in accordance with the Agreement;

h. Enjoin Defendant, preliminarily and permanently, from any further use of the BASSBOSS Mark or any confusingly similar designation;

i. Enter a judgment awarding Plaintiff its costs of suit incurred, including attorneys' fees, including those recoverable under 15 U.S.C. § 1117(a) and Conn. Gen. Stat. § 42-110g(d); and

j. Award Plaintiff any other and further relief to which it may be entitled.

Dated: September 21, 2026

Respectfully submitted,

By: /s/ *John M. Doroghazi*

John M. Doroghazi (ct28033)
Wiggin and Dana LLP
One Century Tower
265 Church Street
New Haven, CT 06510
T: 203.498.4421
jdoroghazi@wiggin.com

*Counsel for Plaintiff True Lee Loudspeakers, LLC*